**Reversed and Rendered and Memorandum Opinion filed December 30, 2025**



In The

# Fifteenth Court of Appeals

## NO. 15-24-00132-CV

**AIRW 2017-7, L.P.; 600 WESTINGHOUSE INVESTMENTS, LLC; 800 WESTINGHOUSE INVESTMENTS, LLC; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; AND JONAH WATER SPECIAL UTILITY DISTRICT, Appellants**

**V.**

**CITY OF GEORGETOWN, TEXAS, Appellee**

**On Appeal from the 261st District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-23-001004**

## MEMORANDUM OPINION

Appellant Texas Commission on Environmental Quality (the "Commission") issued an order granting a wastewater discharge permit to appellant AIRW 2017-7, L.P. ("AIRW"), allowing it to construct and operate a new wastewater treatment plant in Williamson County, Texas. Appellee the City of Georgetown (the "City") sought judicial review of the Commission's decision in the trial court, which

reversed. The Commission, AIRW, and other parties before the trial court with an interest in this matter—600 Westinghouse Investments, LLC, 800 Westinghouse Investments, LLC, and Jonah Water Special Utility District—appealed to this Court. Because we conclude that substantial evidence supports the Commission's decision, we reverse the trial court's judgment and render in favor of appellants.

## BACKGROUND

The federal Clean Water Act regulates the discharge of pollutants into a water of the United States through the National Pollutant Discharge Elimination System framework. 33 U.S.C. §§ 1251–1389. Pursuant to this framework, the United States Environmental Protection Agency has the authority to issue wastewater permits to allow such discharges, which it has delegated to the State of Texas. 33 U.S.C. § 1342(a)(l), (b); 63 Fed. Reg. 51164 (Sept. 24, 1998). The Texas Legislature in turn has authorized the Commission to administer the State's wastewater-discharge permitting program under the Texas Water Code. Tex. Water Code § 26.027.

AIRW, 600 Westinghouse Investments, LLC, and 800 Westinghouse Investments, LLC (collectively, "Developers") are developing an approximately 128-acre tract of land in the City's extraterritorial jurisdiction, seeking to build hundreds of housing units and two duplex developments. This land consists of two residential properties, the Mansions of Georgetown III and Luxe of Georgetown, with the former owned by 800 Westinghouse and the latter by 600 Westinghouse, as well a tract owned by AIRW. To acquire wastewater service for these properties, the Developers contacted several wastewater service providers in the area, including the City. City personnel informed the Developers that in order to receive wastewater services, the Developers must agree to let the City annex their properties. City personnel maintained this position despite repeated attempts by the Developers to negotiate another solution.

2

AIRW thereafter applied to the Commission for a wastewater permit to construct and operate a wastewater treatment plant on its own property and to discharge wastewater from this facility. The Commission's executive director concluded AIRW's application met with all applicable statutory and regulatory requirements and issued a draft permit. The City and Jonah Water Special Utility District ("Jonah Water") objected to the executive director's decision and requested a contested case hearing, which led to the application being forwarded to the full Commission. The full Commission issued an interim order referring the matter to the State Office for Administrative Hearings ("SOAH") for a contested case hearing on eight issues raised by the City. One of these issues was whether the permit was consistent with the Commission's regionalization policy, which encourages the combination of community wastewater systems for improved planning operation or management. Other issues the City raised relevant for our purposes include (1) "[w]hether the draft permit is protective of water quality and the existing uses of the receiving waters;" (2) "[w]hether the draft permit is protective of the health of the nearby residents;" (3) "[w]hether the draft permit complies with applicable requirements regarding nuisance odors;" (4) "[w]hether the application is substantially complete and accurate;" and (5) "[w]hether the draft permit complies with [the Commission's] antidegradation policy and procedures . . . ."

Before the hearing began, the Westinghouse entities entered into Non-Standard Service Agreements with Jonah Water, agreeing that Jonah Water would own and operate the new wastewater facility after the wastewater permit was issued and transferred to Jonah Water. Jonah Water consequently changed its position to support the issuance of the permit. After the contested case hearing, the two Administrative Law Judges ("ALJs") presiding over the hearing recommended the permit be granted. The Commission issued a final order granting the wastewater

3

permit to AIRW and issued findings of fact and conclusions of law supporting its decision. The City moved for rehearing, which was denied by operation of law.

The City filed a petition for judicial review in the Travis County District Court challenging the Commission's order on the basis that it is not supported by substantial evidence and that the Commission reached its decision arbitrarily and capriciously, given the eight issues the City raised in the contested hearing. The Developers and Jonah Water intervened as defendants. After a hearing, the trial court issued a final judgment reversing and remanding to the Commission for further proceedings. The trial court based its decision solely on its conclusion that the Commission's approval did not comply with Texas's regionalization policy:

1. Defendant [the Commission] erred by determining that the Permit complies with Texas's regionalization policy.

2. Because Intervenor AIRW failed to seek a waiver from Plaintiff's city council, there is no way to know whether the city council would be willing to waive the annexation requirement. It is unreasonable to assume that City staff—who are bound by the city council—speak for the city council, which is not bound and has both the power to waive requirements and the ability to act under political considerations. This means that Defendant should not have determined both that (1) Plaintiff denied Intervenor AIRW service; and (2) connection to Plaintiff's system would cost Intervenor AIRW $20 million.

The Developers, the Commission, and Jonah Water (collectively, "Appellants") then appealed.

## STANDARD OF REVIEW

The City on appeal contends that the Commission's order issuing AIRW a wastewater permit was not supported by substantial evidence and was made arbitrarily and capriciously.

The focus of this Court's review, as in the trial court, is on the Commission's

4

order. *Tex. Comm'n on Env't Quality v. San Antonio Bay Estuarine Waterkeeper*, 714 S.W.3d 270, 282 (Tex. App.—15th Dist. 2025, pet. filed). We review the order for substantial evidence. *Save Our Springs All., Inc. v. Tex. Comm'n on Env't Quality*, 713 S.W.3d 308, 320 (Tex. 2025). Under substantial evidence review, we reverse the Commission's decision only if the City's substantial rights have been prejudiced because the order was:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2).

"Whether there is substantial evidence to support an agency's decision is a question of law." *Tex. Dep't of Pub. Safety v. Flores*, No. 15-24-00018-CV, 2024 WL 4887998, at *2 (Tex. App.—15th Dist. Nov. 7, 2024, no pet.) (mem. op.). Substantial evidence review "does not allow a court to substitute its judgment for that of the agency." *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). "Review under the substantial-evidence rule is highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020). Substantial evidence supporting an administrative agency's decision "requires only more than a mere scintilla, and 'the evidence [i]n the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence.'" *R.R. Comm'n*, 912 S.W.2d at 792–93 (quoting *Tex.*

5

*Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). "The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise." *Tex. Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537, 547 (Tex. 2022) (quoting *Charter Med.-Dall.*, 665 S.W.2d at 453).

In contested cases regarding wastewater permit applications such as this, "the draft permit prepared by the executive director of the commission, the preliminary decision issued by the executive director, and other sufficient supporting documentation in the administrative record of the permit application establishes a prima facie demonstration" that the permit "meets all state and federal legal and technical requirements . . . ." Tex. Gov't Code § 2003.047(i-1). A party may rebut this prima facie demonstration "by presenting evidence that . . . demonstrates that one or more provisions in the draft permit violate a specifically applicable state or federal requirement." *Id.* § 2003.047(i-2).

"Arbitrariness is a distinct ground for reversal." *Save Our Springs*, 713 S.W.3d at 320. An agency "acts arbitrarily or abuses its discretion if it fails to consider a mandatory factor, considers an irrelevant factor, considers appropriate factors but reaches a completely unreasonable result, or fails to follow its own regulations." *Id.*

Lastly, we review the meaning of a statute de novo. *Davis v. Morath*, 624 S.W.3d 215, 221 (Tex. 2021). "When construing a statute, our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 253 (Tex. 2023) (quoting *In re Est. of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)). Words not "statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields

6

an absurd result." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). Regarding regulations, "[w]hen a state agency adopts an administrative rule, it commits itself to follow the plain meaning of the promulgated text, which courts should interpret as they would a statute . . . ." *Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*, 707 S.W.3d 102, 104 (Tex. 2025).

## ANALYSIS

Appellants challenge the trial court's judgment, arguing that substantial evidence supports that the Commission's order issuing the AIRW wastewater permit is in accordance with Texas's regionalization policy. The City disagrees, contending substantial evidence does not support the permit's compliance with Texas's regionalization policy and that the Commission's decision was made arbitrarily and capriciously. The City further contends that the Commission erred in issuing the permit on five other grounds not listed in the trial court's judgment. Namely, it erred in concluding that (1) the permit is protective of water quality and the existing uses of the receiving waters; (2) the permit is compliant with Commission antidegradation policy and procedures; (3) the permit protects human health or provides for sufficient operational requirements; (4) the permit violates the applicable requirements on nuisance orders; and (5) the permit application was substantially complete and accurate. We will address these issues in turn.

## I. Substantial Evidence Supports that the AIRW Wastewater Permit Complies with Texas's Regionalization Policy.

The Commission is authorized to "issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water in the state." Tex. Water Code § 26.027(a). It is the policy of the State of Texas "to encourage and promote the development and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of

7

the state and to prevent pollution and maintain and enhance the quality of the water in the state." *Id.* § 26.081(a). In deciding whether to issue a wastewater permit, the Commission "may deny or alter the terms and conditions of [a] proposed permit" based on the "availability of existing or proposed areawide or regional waste collection, treatment, and disposal systems . . . ." *Id.* § 26.0282. Further, the state will use "all reasonable methods to implement this policy" of "encourage[ing] and promot[ing] the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state . . . ." *Id.* § 26.003.

The Commission implemented this policy through a guidance document entitled "TCEQ Regionalization Policy for Wastewater Treatment", which states:

> TCEQ may approve new, renewal, and major amendment applications for discharges of wastewater in any of the following situations where:
>
> . . .
>
> - The applicant requested service from wastewater treatment facilities within the 3 miles, and the request was denied.
> - The applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors.

The focus of the parties' dispute is whether the Commission's order complied with the terms of its regionalization policy. Specifically, the parties contest whether the City denied Developers' request to access the City's wastewater treatment facilities and whether AIRW demonstrated that it should be excepted from the regionalization policy based on cost.

Appellants argue the Commission's order complies with the regionalization policy because there is substantial evidence that the City declined to provide

Developers with access to its wastewater treatment facilities and that the cost exception to regionalization applies. The City responds that it did not deny Developers access to its wastewater services and that the Commission wrongly considered the diminution in value of the Westinghouse entities' residential property developments as a cost to AIRW to connect to the City's wastewater facilities. We hold that substantial evidence supports the Commission's determination that an exception to regionalization applied to the permit at issue on the basis of cost.

The Commission in its findings of fact and conclusions of law sections in its order issuing the permit stated that "[c]osts weigh in favor of granting AIRW's application" and that "[t]he Application demonstrates compliance with TCEQ's regionalization policy," respectively. The record contains several reports and assessments of costs. Upon request of the Commission to submit additional information to justify the proposed permit, AIRW, through its consultant Perkins Engineering Consultants, Inc. ("Perkins"), sent the Commission a letter justifying the need for a permit. In the letter, Perkins examined the cost of connecting to the City and assessed that the cost of complying with the City's annexation condition would reduce the value of the residential developments by $20 million. It based these annexation costs "on lost value of the property when sold, payment of additional City taxes and fees, and costs to comply with the City's zoning requirements." Perkins reasoned that due to the improved value of the land resulting from the residential development projects constructed, "the annual taxes owed to the City will be between $580,600 and $725,750" and that "[t]he lost value of the property attributable to City taxes alone are estimated to be between $13,000,000 and $18,000,000 under the arrangements proposed by the City as conditions of service."

Perkins also notes that the City informed AIRW that some of the land must be dedicated to uses other than residential, such as commercial, and that changing the

use from the planned residential use "represents further loss of value attributable to the conditions of services proposed by the City." Perkins concluded that it would be less costly for AIRW to build its own facility "on the order of $5 million," which is substantially less than the $20 million lost in diminished property value by connecting to the City.

Other record evidence includes an appraisal report by Colliers International Valuation & Advisory Services comparing the projected annexed value of the residential development properties against their non-annexed value. Colliers estimated that there would be a $20 million differential in value of the properties, assuming the projects are completed. Colliers also provided a comparison of the stabilized tax estimate of the properties, projecting that $3,111,601 would be the estimate if the properties are not annexed and $3,801,301 would be the estimate if they are. Under substantial evidence review, evidence supporting an administrative agency's decision "requires only more than a mere scintilla" regardless of whether the evidence in fact preponderates against the agency's decision. *R.R. Comm'n*, 912 S.W.2d at 792–93. The assessments provided above constitute "more than a scintilla of evidence" that the diminution in value of the residential projects resulting from connecting with the City's wastewater services is a cost that the Commission may consider as a basis for excepting AIRW from regionalization.

The City objects that diminution in value is not a "cost," which contemplates actual expenditures, as opposed to a projected valuation of a property. The City contends the "cost" here is the expenditures to connect the residential developments to the City's wastewater services. The City maintains diminution in property value is irrelevant to the regionalization policy and that the Commission's consideration of it was arbitrary and capricious. We disagree. The issue of what "cost" means must be understood within a statutory context that gives the Commission significant

10

discretion to determine whether a proposed permit complies with its regionalization policy. The Texas Water Code does not prescribe specific requirements to be in the regionalization policy, only that the Commission "tak[e] into consideration" the policy "to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state . . . ." Tex. Water Code § 26.003. The Water Code only requires the use of "all reasonable methods to implement" the policy. *Id.* Other contextual evidence of the Commission's significant discretion comes from a provision on assessing proposed wastewater permits, which states that the Commission "*may* deny or alter the terms and conditions of [a] proposed permit" based on the "availability of existing or proposed areawide or regional waste collection, treatment, and disposal systems . . . ." *Id.* § 26.0282 (emphasis added).

With this context in mind, we examine the plain meaning of the word "cost" in the regionalization policy, which is undefined in the statute. *Fort Worth*, 547 S.W.3d at 838 ("Words not statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result."). Black's Law Dictionary contains numerous definitions of "cost", including a definition encompassing the City's understanding: an "expense incurred to achieve some end; the amount charged or price paid for something; an expenditure made for the purpose of procuring something." *Cost*, BLACK'S LAW DICTIONARY (12th ed. 2024). But it also includes the term "opportunity cost", which means "[t]he cost of acquiring an asset measured by the value of an alternative investment that is forgone . . . ." *Opportunity Cost*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Implicit Cost*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("See *opportunity cost*.").

The estimated $20 million diminution of property value is an opportunity cost.

AIRW connecting to the City's wastewater services will mean foregoing the "alternative investment" of building its own wastewater plant and acquiring $20 million in property value for the residential developments. Through the lens of opportunity cost, connecting with the City will result in a projected $20 million cost. Appellants have provided evidence for the basis of this cost—such as city taxes and fees and potential zoning requirements—as discussed in more detail in the assessments of costs in the record. The meaning of "cost" encompassing "opportunity cost" in the policy is "reasonable." Tex. Water Code § 26.003. Notwithstanding this point, diminution in property value would additionally constitute a "relevant factor"—an independent basis for an exception to regionalization. Diminution in property value is a factor a company accounts for, like costs, when evaluating whether to build a facility and considering it as a "relevant factor" is a "reasonable method" of implementing regionalization.

The City also objects that, when reviewing a permit application, the Commission cannot include any consideration of property value and zoning because consideration of those issues is outside of its authority. In support of its position, the City points to a webpage on the Commission's website, which states "[t]he issues TCEQ can consider when we review a permit application are set by the Legislature through state law. Under those laws, we do not have the authority to consider certain matters when we review a permit application." *Concerns Outside of TCEQ's Authority*, TEX. COMM'N ENV'T QUALITY, https://www.tceq.texas.gov/agency/decisions/participation/permitting-participation/concerns-outside-of-tceqs-authority (last visited Nov. 12, 2025). Further down the webpage, the Commission notes that "some matters fall outside of our jurisdiction" and lists "[z]oning" and "[e]ffects on property values" as two such matters. *Id.* The City contends the Commission acted arbitrarily and capriciously in

considering the diminution of property value—and zoning as a component of that assessment—as a cost because it was outside the Commission's authority to do so.

Looking at the cited webpage in full context, it becomes clear that the cited language is inapplicable here. The webpage pertains to what concerns of the general public the Commission can legally consider as to the permitting process. It does not relate to what the Commission can consider under its regionalization policy. The webpage at issue falls under the website heading "Pending Permits: Participating in the Process," which in turn falls under the heading "Public Representation and Participation." *Id.* Further contextual evidence comes from the guide provided on the webpage, "Issues Outside TCEQ's Jurisdiction: Answers to Public Comments We Receive." *Id.* Under this guide, the sections on zoning and property value show that these limitations are directed to public commentators and not the permit applicant:

> ### *Location/Zoning*
>
> ***Commenters express concern regarding the location of the facility, and/or whether it complies with current local zoning ordinances.***
>
> **Response**: Generally, TCEQ does not have jurisdiction to consider facility location choices *made by an applicant* when determining whether to approve or deny a permit application, unless a statute or rule specifically requires the Commission to consider some aspect of the location.
>
> . . .
>
> ### *Property Value*
>
> ***Commenters express concern about possible devaluation of property in the area.***
>
> **Response**: TCEQ does not have jurisdiction to consider whether the *proposed activity* will impact development, property values, property transactions, or investment property when determining whether to approve or deny a permit application . . . The Executive Director's review of a permit application is limited to whether the application and

proposed activities meet the requirements of applicable TCEQ rules.

TCEQ External Relations Division, *Issues Outside TCEQ's Jurisdiction: Answers to Public Comments We Receive*, GI-650 at 1–2 (2024) https://www.tceq.texas.gov/downloads/agency/decisions/participation/gi-650-issues-outside-tceqs-jurisdiction-x.pdf (emphasis added). These questions and answers denote that the Commission cannot consider public concern over where the permit applicant places its facility or how the applicant's proposed activity affects the surrounding area unless the law or Commission rules state otherwise. Nothing in this guide or the webpage discuss the regionalization policy. Moreover, the guide makes clear that the sources of these limitations are statutes and administrative rules. The City points to no such statutes or rules—or any binding authority[1]—prohibiting zoning and property values from being considered as costs. Indeed, as discussed earlier, the Water Code gives the Commission significant discretion to determine what constitutes a cost under its regionalization policy, so long as it employs "reasonable methods" in doing so. Tex. Water Code § 26.003.

The City further objects that the Commission acted arbitrarily and capriciously in considering the diminution of value of the residential properties as a cost to AIRW because AIRW, the permit applicant, does not own those properties. The City notes that AIRW owns the property where the wastewater facility will be built but that the Westinghouse entities own the properties where the residential developments are to be built. It is true that AIRW does not own the residential developments, but the City cites to no provision in the regionalization policy or

---

[1] The City cites to responses to public comments and interim orders made by the then Texas Natural Conservation Commission executive director—now the Commission—stating it lacked the statutory authority to consider property values. These responses and interim orders may reflect past practice, but they are not the law and do not usurp the Commission's discretion to use "reasonable methods" to implement regionalization. Tex. Water Code § 26.003.

14

elsewhere stating that the diminished property value of third parties can never be considered as a cost to the permit applicant. In some circumstances this may be the case, but the consideration of the lost property value to the Westinghouse entities here is "reasonable" given the relationship between AIRW and the Westinghouse entities and the broader context at play here. *Id.* The Westinghouse entities are affiliates of AIRW and it is undisputed that all three are engaging in a joint project to build residential housing. It is also undisputed that AIRW wishes to build a wastewater plant with the specific purpose to serve Westinghouse entities' developments. Without these residential developments, there would be no reason to build the wastewater plant—the value of the plant is tied to these developments. Given this interconnectedness of AIRW and the Westinghouse entities' projects, it is reasonable to consider the diminution of the Westinghouse entities' developments as a cost[2] serving as a basis to except AIRW's permit from regionalization.[3]

We hold that substantial evidence supports that the Commission's order granting AIRW's wastewater permit complies with the Commission's regionalization policy.

## II. Substantial Evidence Supports the Commission's Order that the Permit is Protective of Water Quality.

The City argues generally that the evidence in the record does not support a conclusion that AIRW's permit is protective of water quality and the existing uses of receiving waters, including protection of aquatic and terrestrial wildlife, as required by the Texas Surface Water Quality Standards ("Water Quality Standards") that the Commission promulgated. Appellants respond that there is substantial

---

[2] As well as a "relevant factor."

[3] As this resolution disposes of the issue, we do not reach the argument of whether the request to connect to the City's wastewater services was denied.

evidence that the permit complies with water quality standards and that the City, which had the burden to present evidence disputing the accuracy of AIRW's water quality evidence, failed to do so. We hold that there is substantial evidence that the permit is protective of water quality.

The Water Quality Standards provide that it is the policy of this state to "maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries . . . ." Tex. Water Code § 26.003; 30 Tex. Admin. Code § 307.1; *see also id.* § 307.1–10. For this argument, the City does not specify any provision in the Water Quality Standards that the draft permit does not comply with. Rather, it only cites to witness testimony opining that the draft permit lacks adequate sampling. Appellants, on the other hand, cite testimony and documentation from Commission and AIRW personnel affirming that the draft permit protects water quality based on an analysis of model results for the receiving water the proposed discharge is to go into as well as an assessment on the impact of such discharge on aquatic life and human health. This evidence supports AIRW's permit being protective of water quality by more than a scintilla and so constitutes substantial evidence. *R.R. Comm'n*, 912 S.W.2d at 792–93.

## III. Substantial Evidence Supports the Conclusion that the Permit Complies with the Degradation Policy and Procedures.

The City argues that the Commission abused its discretion in issuing the AIRW permit because the record does not support that the permit complied with antidegradation policy and procedures. Specifically, the City contends the Commission in its antidegradation review failed to properly assess whether the permitted activities would disturb or impermissibly degrade existing water quality. Appellants respond that the record contains sufficient evidence that the Commission

properly conducted this inquiry.

By Commission rule, degradation means "a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired." 30 Tex. Admin. Code § 307.5(b)(2). Commission rules "prescribe antidegradation standards for permitted discharges into three tiers of waterways." *Save Our Springs*, 713 S.W.3d at 313. At issue here are Tiers 1 and 2. Under Tier 1, "[e]xisting uses and water quality sufficient to protect those existing uses must be maintained." 30 Tex. Admin. Code § 307.5(b)(1). Under Tier 2, "[n]o activities subject to regulatory action that would cause degradation of waters that exceed fishable/swimmable quality are allowed" absent special circumstances not relevant here. *Id.* § 307.5(b)(2). "Fishable/swimmable waters are defined as waters that have quality sufficient to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water." *Id.* In sum, "TCEQ may issue a waterway discharge permit to the City only if it has determined that the permitted activities would neither (1) disturb existing water uses nor (2) degrade the water." *Save Our Springs*, 713 S.W.3d at 313–14. The City argues that the Commission's antidegradation review failed to consider (1) the narrative standard for the protection of aesthetic values; (2) the land uses around the receiving water body; (3) criteria protective of livestock watering, irrigation, or terrestrial wildlife; and (4) aquatic life in the downgradient stream to which treated wastewater would eventually flow.

The record provides substantial evidence that the Commission complied with the antidegradation policy and procedures in issuing the permit. As neither party disputes, the Commission conducted a Tier 1 and 2 antidegradation analysis. The record contains evidence that this analysis considered the four matters the City raises. On aesthetic values, the permit itself prohibits discharges that would violate aesthetic standards such as visible oil, foam, froth, and floating solids. One of the

17

Commission's expert witnesses who conducted the analysis, Jenna Lueg, testified that she reviewed whether the discharges would cause turbidity in the affected waters. Preventing and minimizing these effects are specifically required by the rule on aesthetic parameters the Commission promulgated. 30 Tex. Admin. Code § 307.4(b)(2), (5)–(7). This testimony is substantial evidence of compliance.

On land uses, the City takes issue with Ms. Lueg's testimony that she does not always look at how proposed discharges will affect developments that are still under construction. The development under construction here is a green space in a residential development. Contrary to what the City claims, the antidegradation review does not look to future land uses. The Tier 1 and 2 antidegradation review focuses on the preservation of "existing uses" of water. 30 Tex. Admin. Code § 307.5(b)(1)–(2). Ms. Lueg affirmed in her testimony that she writes permits "based on the circumstances that are on the ground at the time the application is prepared and filed" and not what might be developed at a site later. A Commission permit reviewer involved in reviewing the permit, Gordon Cooper, also testified to the same. This testimony is substantial evidence that current land uses were considered. The City cites to no law, rule, or guidance requiring the Commission to evaluate how discharges will affect speculative future land uses.

Looking to criteria protective of livestock watering, irrigation, terrestrial wildlife, and the status of aquatic life, the record evidences the Commission considered these matters in its executive director responses to public comments. In one of those responses, the executive director states the draft permit sets effluent limitations and requires AIRW to operate the wastewater facility in compliance with Commission regulations on water quality standards to address these concerns. These requirements are reflected in the permit itself. On complying with these water quality standards, the executive director states "[w]ater in the state must be maintained to

18

preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three." The executive director's response and the draft permit are substantial evidence that the effects of the future discharge were considered.

## IV. Substantial Evidence Supports that the Permit is Protective of Human Health.

The City argues the Commission abused its discretion in issuing the AIRW draft permit because the permit failed to include conditions requiring more frequent monitoring and other operational requirements to prevent the discharge of wastewater during potential future operational disruptions. The City specifically points to the permit's not requiring redundant units and storage facilities as a backup for treatment failures or power outages. The City claims the failure to include such requirements makes it unreasonable for the Commission to maintain that the permit protects the health of nearby residents. The City also contends that the Commission failed to include measures to ensure inadequately treated wastewater will not be discharged to the receiving stream. Appellants respond that these conditions are not required by the regulations and that the permit contains protections for human health. We agree with Appellants.

The City cites to no law or regulation requiring a permit to include any of the above conditions. The record contains witness testimony that redundant facilities, such as a second clarifier, are not required by Commission rules and are not necessary given the size of the wastewater facility at issue. One of the City's witnesses who believed two clarifiers were necessary also conceded the rules do not require it. Moreover, as Appellants note, the permit contains conditions and operational requirements to protect human health. Witness Dr. Janet Sims testified

that the permit protects human health through disinfection of treated effluent and monitoring the chlorine residual and E. coli bacteria. She testified that monitoring is required five times a week and that samples will be collected and analyzed for E. coli. Dr. Sims concluded that the average permit limit is 126 colony forming units/most probable number per 100 milliliters, the "criteria established in the [Water Quality Standards] for the protection of human health for primary contact recreational uses." 30 Tex. Admin. Code § 307.7(b)(1)(A). The above testimony constitutes substantial evidence that the permit is protective of human health and that the Commission did not abuse its discretion on issuing the permit on this basis.

## V. Substantial Evidence Supports that the Permit Complies with Applicable Nuisance Odor Requirements.

The City argues that the Commission acted arbitrarily in issuing the AIRW permit because it failed to meet the applicable nuisance odor requirements and failed to consider possible adverse effects of the proposed discharge on a greenspace, as mandated by Section 26.030(b) of the Texas Water Code. Appellants respond that record evidence supports that applicable nuisance odor requirements are met and that the greenspace at issue is not subject to the requirements of Section 26.030(b) because it is not a park.

On the nuisance odor requirements, Commission regulations mandate that the permittee must meet one of three alternatives "as a compliance requirement to abate and control a nuisance of odor prior to construction of a new wastewater treatment plant unit . . . ." 30 Tex. Admin. Code § 309.13(e). One of these alternatives is that the wastewater plant "not be located closer than 150 feet to the nearest property line . . . ." *Id.* § 309.13(e)(1). The parties do not dispute AIRW chose this option and owns a 150-foot buffer zone between its wastewater plant and the nearby Patterson Ranch property. The City claims that the permit only temporarily meets this buffer

requirement because the abutting County Road 111 is set to be realigned. Once realigned, the City asserts the buffer zone will be lost because the road will no longer buffer the wastewater plant from the Patterson Ranch subdivision. But evidence in the record indicates that even with the forthcoming realignment there will still be a 150-foot buffer zone. The buffer zone map shows the buffer runs from the treatment plant units to a "Facility Boundary" and not to any road. An AIRW witness also testified that the 150-feet requirement will still be met after the realignment because a 150-feet buffer will still exist "between the treatment units and the nearest property line." Substantial evidence therefore supports that the permit complies with the applicable nuisance order requirements and that the Commission did not abuse its discretion in issuing the AIRW permit on these grounds.

Turning to the potential adverse effects of proposed discharge on a greenspace, Section 26.030(b) states the Commission in issuing a permit to discharge effluent "shall consider any unpleasant qualities of the effluent, including unpleasant odor, and any possible adverse effects that the discharge of the effluent might have on the recreational value of the *park*, playground, or schoolyard." Tex. Water Code § 26.030(b) (emphasis added). The parties agree that there is planned greenspace on Patterson Ranch but they dispute whether such greenspace is a "park" under Section 26.030. The City asserts the greenspace is a park while Appellants contend that the greenspace is not a park because a park must be recreational and the City cites to no evidence that the greenspace will be recreational.

As "park" is undefined in the statute, we look to its plain meaning. *Fort Worth*, 547 S.W.3d at 838 ("Words not statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result."). Black's Law Dictionary in relevant part defines "park" to mean "[a] large open area usu[ally] with grass and

trees, esp[ecially] in a city or town, for public recreation" and "[a] large grassy area of usu[ally] private land surrounding a big house in the countryside." *Park*, BLACK'S LAW DICTIONARY (12th ed. 2024). The former definition supports an understanding of "park" focused on recreation while the latter is broader and could encompasses non-recreational uses. Given the emphasis in Section 26.030(b) on the "recreational value" of the places listed, we hold that the first definition applies here. This is buttressed by those places listed surrounding the word park, "playground" and "schoolyard," which are both places of recreation. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011) ("The canon of statutory construction known as *noscitur a sociis*, or 'it is known by its associates' directs that similar terms be interpreted in a similar manner.").

The City asserts that the greenspace is recreational but specifies no evidence supporting this claim. Appellants, on the other hand, cite to Dr. Sims' testimony affirming that there is no "evidence of parks, playgrounds, or schools on the Patterson Ranch" and, although acknowledging the existence of the greenspace, affirmed it was not a "public park." The City has the burden to "present[] evidence that . . . demonstrates that one or more provisions in the draft permit violate a specifically applicable state or federal requirement." Tex. Gov't Code § 2003.047(i-2). Given the lack of evidence of recreational use provided, we hold the City failed to meet its burden to demonstrate the permit violated the requirements of Section 26.030(b).

## VI. Substantial Evidence Supports that AIRW Provided All Information Reasonably Required by the Commission for Its Permit Application.

Section 26.027(b) of the Texas Water Code states that "[a] person desiring to obtain a permit or to amend a permit shall submit an application to the commission containing all information reasonably required by the commission." The

Commission after receiving the application must determine if it is administratively complete. 30 Tex. Admin. Code § 39.418(a). The City argues the Commission improperly reviewed AIRW's permit application because it was not substantially complete under Section 26.027(b) due to its having allegedly incomplete and inaccurate responses and not listing Jonah Water and 600 Westinghouse Investments as applicants. Appellants respond that the record evidence shows the information AIRW provided in its application was sufficient and that Jonah Water and 600 Westinghouse did not need to be listed as applicants. We agree with Appellants.

On incomplete and inaccurate responses in the permit application, the City claims that AIRW's application does not include information on the need of the proposed wastewater plant, data on population estimates and growth rates of the planned residential communities, accurate maps of existing nearby wastewater facilities and the area where the wastewater facility at issue is planned to be built, information on whether the City denied wastewater services, an accurate notice document, accurate responses to an administrative report, and whether the facility at issue will be above the 100-year floodplain level. The City separately claims that Jonah Water and 600 Westinghouse needed to be listed as permit applicants because it alleges the former will operate the facility and the latter co-owns the facility.[4] But the City cites to no law or regulation requiring the Commission to receive and consider this information before it can issue a permit. Indeed, Section 26.027(b) sets

---

[4] We note that Commission regulations require "the owner of a facility to submit an application for a permit . . . ." 30 Tex. Admin. Code § 305.43(a). The City does not argue this rule applies to 600 Westinghouse or Jonah Water, but even if it did, this rule does not mandate these entities be listed as permit applicants. Concerning 600 Westinghouse, Appellants provide evidence, unrebutted by the City, that 600 Westinghouse conveyed the property at issue to AIRW and so does not own the facility. Regarding Jonah Water, even assuming it is currently an operator of the wastewater facility, Commission regulations only require an operator to be a permit applicant if the Commission "determines that special circumstances exist where the operator or the operator and the owner should both apply for a permit . . . ." *Id.* The City does not present evidence that the Commission made such a determination.

minimum requirements for applicants who are individuals but not for entities. Tex. Water Code § 26.027(b)(1)–(5).

Section 26.027(b) does not otherwise impose requirements on the Commission but rather puts guardrails on what information it can require from an applicant—namely that such information be "reasonable." Record evidence shows the Commission in its decision granting the permit determined that "[t]he Application included all required information and was substantially complete and accurate." Mr. Cooper also testified that Commission staff during its review process requested additional information from AIRW and as a result of this process declared the application administratively and technically complete. Substantial evidence supports that the Commission received and considered all information it reasonably required from AIRW's permit application. For the reasons stated above, we reverse the trial court's judgment and render judgment affirming the Commission's order granting AIRW the wastewater permit at issue.


<u>/s/ April Farris</u>
April Farris
Justice

Panel consists of Chief Justice Brister and Justices Field and Farris.